UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

James Wesley Moss and Florida Pharmacy
Solutions, Inc.,

          Plaintiffs,                    Case No.

vs.

James R. Brown, Janice Brown,  Pierre Rodrique
Joncas a/k/a Peter Joncas, Joseph Schilleci, Jason
Tortorici, Schilleci & Tortorici, P.C.,  Edie Mae
Hand , Robert Hubbard , Mill City Gold Corp., FPS
Pharma Inc., , Herbert Leary, Gordon S. McKinnon,
the Bank of Nova Scotia, and John Doe, the said
name being fictitious,

          Defendants.

_____/

## VERIFIED COMPLAINT
## REQUEST FOR INJUNCTIVE RELIEF
## AND JURY DEMAND

       Plaintiffs James Wesley Moss and Florida Pharmacy Solutions, Inc. Complain of the

Defendants as follows:

## NATURE OF THE ACTION

       1.     This Complaint is an action seeking redress and remedies for injuries and

damages jointly and severally sustained by Plaintiffs and currently ongoing, which damages have

been and still are actively being caused by Defendants (except for the Bank of Nova Scotia) in

violation of 18 U.S.C. §1961, *et seq.*

## PARTIES

### Plaintiffs

2.      Plaintiff James Wesley Moss ("Moss") is an individual who resides at 7793 Basnett Circle, Kissimmee, Florida.  L  34747.   JWM has an ownership interest in Florida Pharmacy Solutions, Inc. and is its President and Chief Executive Officer.

3.      Florida Pharmacy Solutions, Inc. ("FPS") is a Florida Corporation, with a principal place of business at 38444 5th Avenue, Zephyrhills, Florida 33542.   The claims of FPS are brought by shareholder Moss as derivative claims.

### Defendants

4.      Defendant James R. Brown ("Brown") is an individual who resides at 4719 Chapel Road NW, Calgary AB, T2L 1A&, Canada.  Brown asserts that he is a shareholder and President of Defendant Mill City Gold Corp. and that he is a shareholder and the  President and Chief Executive Officer and Chairman of FPS Pharma, Inc.  Brown is named in his individual capacity and in all of his corporate capacities.

5.      Defendant Janice Brown ("JB"), is an individual who resides at 4719 Chapel Road NW, Calgary AB, T2L 1A&, Canada,    JB asserts that she is the majority shareholder, Chief Financial Officer, Corporate Secretary, and Director of FPS Pharma, and Secretary of Florida Pharmacy Solutions, Inc.  JB is named in her individual and in all of her corporate capacity.

6.      Defendant Mill City Gold Corp. ("Mill City") is a Canadian Corporation with a principal place of business at 4719 Chapel Road NW, Calgary, AB T2L 1A7, Canada, and since in our about August of 2015 purports to transact business as FPS Pharma Inc. and Florida Pharmacy Solutions, Inc.

102390512.1

7.     Defendant FPS Pharma Inc. ("Pharma") is a corporate name used by Mill City. Pharma is controlled by Brown and JB and, since August of 2015, fraudulently purports to be the parent and sole shareholder of FPS.

8.     Defendant Edie Mae Hand ("Hand") is an individual who resides at 7420 Briarcliff Road, Dora, Alabama 35062.

9.     Defendant Robert Hubbard ("Hubbard") is an individual who resides at the Shangri La Hotel, Horizon Club Floor, Kota BNI JL. Jend. Sudirman Kav. 1, Jakarta, 10220, Indonesia.

10.     Defendant Joseph Schilleci ("Schilleci") is an attorney at law of the State of Alabama and a member of the law firm of Schilleci & Tortorici, P.C., 12 Montgomery Hwy #210, Birmingham, Alabama.

11.     Defendant Jason Tortorici ("Tortorici") is an attorney at law of the States of Alabama and California and a member of the law firm of Schilleci & Tortorici, P.C., 12 Montgomery Hwy #210, Birmingham, Alabama.

12.     Defendant Schilleci & Tortorici, P.C., is a law firm with a principal place of business at 2821 2nd Avenue South, Birmingham, Alabama 35233.

13.     Defendant Herbert Leary ("Leary") is an individual who resides at 1620 Palisades Drive, Pacific Palisades, CA, and contends that he is a director of Pharma.  Leary is named in both his individual and corporate capacity.

14.     Defendant Gordon S. McKinnon ("McKinnon") is an individual who resides at 44 Deepwood Crescent, Toronto, ON M3C 1N8, and contends that he is a director of Pharma. Leary is named in his individual and corporate capacity.

15.     Defendant Bank of Nova Scotia is a publically traded financial institution with its

- 3 -

principal place of business at 44 King Street West Scotia Plaza 8Th Fl. TORONTO, ON M5H

1H1 Canada. It is not alleged that the Bank of Nova Scotia committed any wrongdoing, and it is

named only because it is impacted by the relief sought in this Verified Complaint.

16.     Defendant JOHN DOE represents one or more fictitiously named defendants

whose identities are unknown.

## JURISDICTION

17.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331,

which provides that the District Courts shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States.

18.     This Court has original jurisdiction over this matter pursuant to 18 U.S.C. §1961

and 18 U.S.C. §1965 due to violations of the Racketeer Influenced and Corrupt Organizations

Act ("RICO").

## VENUE

19.     Venue is proper before this Court pursuant to 28 U.S.C. §1391(b), 28 U.S.C.

§1391 (c), and 18 U.S.C. §1965 because, inter alia, Moss is a resident of Kissimmee, Florida,

FPS is a Florida Corporation doing business in Zephyrhills, Florida, and Pharma purports to

control FPS. Both the direct claims and the derivative claims asserted in this matter arose in the

State of Florida, within the jurisdiction of this Court..

## FACTS COMMON TO ALL COUNTS

### a.  The Beginning of the Corrupt Scheme

20.     FPS is a closely held Florida corporation and a full service compounding

pharmacy specializing in providing pain and wound creams, among other things.

21.     Moss and his brother Cary Moss owned two thirds of the stock of FPS, and Moss

directed the affairs of FPS.

22.    At some point prior to April of 2015, although the exact date is unknown, Defendants Brown, JB, Hand, Hubbard, and Mill City entered into a corrupt plan to defraud Moss and the other shareholders of FPS into turning over to Brown, JB, and Mill City the ownership of FPS.

23.    Pursuant to this corrupt plan, the Defendants took certain actions.

24.    After unsuccessfully badgering Moss's father Shirley A. Moss to meet Brown, Hand turned her attention to Moss.   In or about April 2015, at the urging of Hand, who claimed to know Brown and who introduced Moss to him, Moss met with Brown and Hand in Los Angeles, California.   At that time, and over the next few weeks, there was proposed by Brown to Moss a general structure whereby Brown would develop a private placement in which he and his Asian contact Hubbard would assist FPS in opening new markets in Asia.   According to Brown, the Asian operation of FPS would be jointly owned by Moss, Brown  and the other shareholders of FPS and of Mill City, while FPS in Florida would continue to be owned and operated by Moss and the existing FPS shareholders.   Brown  proposed that he would assist the Asian operation in becoming publically traded.

25.    At that time and at all times thereafter, it was the essential understanding of Moss that he would continue to operate FPS in the United States as he had always done, without any intrusion from the Brown group of Defendants.

**b.  Brown Begins to Execute His Plan, Assisted by Joncas, Hand, and Hubbard.**

26.    Between  May 15 and May 17, 2015, Brown and Hubbard both sent emails to Moss booking and paying for a plane ticket for Joncas, who was an agent of Brown, JB, and Mill City, to travel from Toronto to Florida.   The actual reason for this trip was for Joncas to perform

a financial evaluation of FPS for Brown and his cohorts.

27.     As part of this corrupt plan, between on or about May 13 and May 17, 2015, Brown solicited and Moss provided information which Brown claimed he needed for inclusion in a listing statement with the Canadian Securities Exchange ("CNSE").

28.     It was Moss's understanding, based upon Brown's representations, that this CNSE listing would be for the company being formed to compete in Asia.

29.     Hubbard, who had close personal ties with Joncas, endorsed Joncas to Moss and urged Moss to move the process forward.

30.     In fact, the actual intention of Brown, JB, Hubbard, Hand, Joncas, and Mill City was already established.   It was to fraudulently acquire ownership of all of FPS, loot it of all its cash, shut down the business, and leave Moss with worthless stock in a Canadian shell corporation.

31.     Thereafter or about May 31, 2015, Brown, Hubbard and Joncas started to analyze the FPS ownership agreement.   At that time Brown insisted on Moss ousting Lindsay Fladd, another FPS shareholder, and restructuring FPS.

32.     In June of 2015, an acquaintance of Hubbard, by the name of Haimana Romana ("Romana"), advised Moss to stay away from Hubbard.   Romana confirmed that money was being exchanged internationally between Hubbard and Brown and that Hubbard was trying to sell shares in FPS based on inflated sales figures. Romana also threatened to go to the Toronto Securities Commission and the Toronto Venture Capital Exchange.   All of Romana's comments are documented via email.

> **c.   Two Alabama Lawyers, Schilleci and Tortorici, Join in the Corrupt Plan and Help to Move it Forward.**

33.     At some point prior to early July of 2015, Brown informed Moss that it would be

necessary for Mill City to acquire all of FPS, since this would be required by the CNSX. However, Brown also assured Moss that this was for technical reasons only and that it would not change the original structure of the deal.    Brown pressed Moss to consummate the transaction.

34.     In furtherance of Brown's pressure on Moss to consummate the transaction, Hand introduced Moss to Alabama attorney Joseph Schilleci of the law firm of Schilleci & Tortorici, LLC.  Both Schilleci and his partner Tortorici were hired by Moss and encouraged and pressed him to execute the documents which Brown wanted.

35.     Throughout this process, Schilleci, Tortorici, and their two-person law firm Schilleci & Tortorici, were in league with Hand and Brown and advocated  only the best interests of Hand and Brown and never the best interests of Moss.

36.     In fact, Schilleci, Tortorici, and Schilleci & Tortorici were in a hopeless conflict of interest, were working against the best interests of their client Moss, and thereby committed multiple violations of the ethical rules governing Alabama attorneys, including but not limited Rules 1.7, 1.8, and 1.9 of the Alabama Rules of Professional Conduct, and also committed multiple acts of malpractice .

### d. Brown, Assisted by Schilleci and Tortorici, Tricks Moss Into Signing Documents.

37.     Through July of 2015, Brown and his team became intimately familiar with the accounting records of FPS.

38.     On or about August 3, 2015, Moss was presented by Schellici with a one and one-half page Letter of Agreement which purported to sell one hundred percent (100%) of the stock of FPS to Mill City in exchange for 25,000,000 "common shares" of Mill City, which were to be held in escrow and released to the FPS shareholders – set forth on an annexed schedule – over four years.

102390512.1

39.     It is unclear who drafted the Letter of Agreement, but it was not Moss or anyone at his direction.

40.     Unlike other conventional agreements for similar transactions, the Letter of Agreement presented to Moss said nothing about receivables, payables, pending litigation, representations or warranties by either the buyer or the seller, indemnifications, bank accounts, cash on hand, taxes, financing statements, liens, pharmaceutical licenses, or any of the myriad of topics that an actual, legitimate Agreement would address.  Instead, this Letter of Agreement was a sham, intended only to separate FPS from its cash on hand and receivables.

41.     When he executed the Letter of Agreement, at Schellici's insistence, Moss thought that it provided at most an outline for a transaction which might or might not take place in the future.  He did not understand that its true intended impact was to consummate a sale of his entire company.

42.     The daily operations of FPS had always been managed by Moss.

43.     The August 3, 2015 Letter of Agreement (Attached as Exhibit A) provided:

> Upon closing of the transaction contemplated herein, FPS shall continue as an ongoing Florida corporation that is a wholly owned subsidiary of Mill City.  Thereafter, the day to day operations, management and decision making related to FPS' business shall be determined by FPS' existing management in conjunction with Mill City.

44.      This promise, intended to pacify Moss, was false.

45.     The Letter of Agreement further provided that the transaction contemplated therein was conditioned on the approval of any regulatory bodies having jurisdiction over the trading of the shares of Mill City, including the CNSE

### e.   Brown and Mill City Press Forward.

46.     The acquisition of FPS by Mill City and the issuance of the Mill City Shares were

approved by the resolution of the Mill City board of directors dated August 4, 2015, and were conditioned on the approval of such exchange having jurisdiction over the trading of the shares.

47.     Mill City issued a press release regarding the Letter of Agreement without Moss's knowledge. Notwithstanding the fact that Schilleci had been supposedly representing Moss during the transaction, he agreed at Brown's direct request via email to participate in a conference call to discuss concerns about the Letter of Agreement.  Schilleci was, at the time, representing various of the Defendants in this matter.

48.     Between August 11, 2015 and at least August 18, 2015, Brown emailed both Moss and Schilleci concerning CNSE approval, taking over FPS accounting functions through Joncas, putting in place a resolution for appointment of officers and directors, signatures on bank accounts, and the use of Schilleci's firm as resident agent in Alabama. Notwithstanding their divergent interests, Schilleci readily agreed in writing to respond to both Moss and Brown with legal advice, including but not limited to preparing a resolution, bank accounts signature information, resident agent.

49.     At no point did Schilleci or Tortorici or Schilleci & Tortorici indicate to Moss that any of them might have a conflict of interest and that Moss or Brown should retain separate counsel.

50.     Throughout August of 2015, Brown continued to press Moss to give Mill City access to FPS bank accounts, with the assistance of Schilleci who was tasked by Brown with preparing the necessary corporate documents. Brown lied to Moss by telling him that giving Mill City access to the bank accounts meant that they were "achieving the objective,"

51.     Purportedly in or around August 2015, without Moss's knowledge, a Form 2A Listing Statement ("Listing Statement") was prepared for an entity know as FPS Pharma, Inc. to

file with the CNSX in order to seek approval to publically list its shares,  Inexplicably, the Listing is dated July 6, 2010.

52.     According to Listing Statement, Pharma was purported to be the successor in interest to Mill City by virtue of a name change.

53.     Moss did not see the Listing Statement until well after the fact.

54.     In further perpetration of the scheme to defraud the Plaintiffs, Brown pushed Moss, via email on August 20, 2015, to sign an escrow agreement making Pharma the escrow agent for four-year release of the Mill City stock.  Brown sent the escrow agreement to Schilleci for review.

**f.  Brown and Pharma Try to Take Control.**

55.     On or about August 21, 2015, Pharma, as sole shareholder of FPS, voted to appoint new directors of FPS, namely, Brown,  Joncas, and JB (the "New FPS Directors").  The New FPS Directors now outnumbered Moss by 3 – 1.

56.     Also on or about August 21, 2015, Pharma Directors voted that with respect to any and all banks where FPS has an account, the New FPS Directors had check-writing authority and that any check could be signed by any two of them.   According to this Resolution, Moss could not sign a check unless co-signed by one of the new FPS Directors.

57.     These actions, with regard to the composition of the Board of Directors of FPS and check writing authority of FPS, were designed solely to allow Brown and his co-conspirators access to the cash of FPS.

58.     On or about August 24, 2015, a majority of the shareholders of Pharma ratified the Letter Agreement via resolution.

59.     On August 25, 2015 in order to pretend to address Moss's concerns, Brown

suggested that they could make a ministerial  change the Directors' Resolution to add Moss's brother Cary as a Director because "at this stage of our deal as we are very close to closing."

60.     On August 27, 2105 Brown insisted via email that Moss update the FPS Florida Department of State account ("Sunbiz") to reflect the Pharma acquisition and to give Brown access information to Sunbiz so that Brown's wife JB could take over the FPS filings. According to these  emails, Schilleci was aware that this was transpiring while he continued to represent all parties.

61.     Upon information and belief, shares of Pharma were never approved for public trading.

62.     The Listing Statement only identifies FPS as having pharmaceutical industry experience, but does not list any industry experience on the part of any of the Defendants, nor did any of the Defendants have any such experience.

> **g.  Follow the Money.**

63.     As part of the Listing Agreement, the Pharma group represented that it had $2,500,000 in working capital.  This was a lie.

64.     As confirmed by financials filed in litigations currently pending in the U.S. District Court for the Northern District Alabama, Northern Division, Case 3:15-CV-01314-AKK, the Defendants never had the $2,500,000 in working capital that they fraudulently represented they had in order to perpetrate their scheme.

65.     Instead, the Defendants intended to steal this money from FPS.

66.     One of the key precepts of any transaction which Moss was willing to enter into with Brown was that neither Moss nor FPS would never have to put up any money and that FPS would not fund any of the transaction.  This was agreed to by Brown.

67.     However, in direct contradiction to these promises, on or about August 31, 2105, Brown directed Moss to transfer all FPS funds to a Chase bank account under the pretense that CNSE was requiring Pharma to provide details of all funds on hand, when in reality Defendants simply wanted to have  access to all funds in all accounts.

68.     Via emails on September 1, 2015 to Moss, Brown informed him without any substantiating proof that the CNSE required confirmation of the receipt of the $2,500,000 by Pharma and that Pharma have the ability to access banks accounts, and insisted that the money had to be wired from the Chase accounts to a Pharma account at the Bank of Nova Scotia in Calgary.  The Bank of Nova Scotia account was one to which Moss never had  access.

69.     At this point Moss implored his lawyer Schilleci to protect him.  Not only did Schilleci not do so, but he supported Brown.

70.     In order to access the "working capital" that Brown and Pharma had fraudulent represented they already had on hand, and in order to perpetrate their scheme, on or around September 2 2015, Defendants took $800,000 out of FPS's Chase bank account and moved it to the Bank of Nova Scotia.

71.     At or about the same time, Schilleci told Moss that the CNSE was demanding that $2,500,000 had to be in the Pharma account and that the transfer had to be initiated by FPS to show that Pharma and FPS were one company.

72.     Moss told Schilleci that FPS and Pharma were not one company and that he wanted to stop the entire transaction immediately and have his money returned.

73.     In response, Schilleci advised Moss that he had to send Pharma even more money because he had signed the closing documents.  Moss did not realize, nor had it been explained to him, that the transaction had closed.

74.     Schilleci told Moss that he was required to wire $1.2 million to Pharma Bank of Nova Scotia account, but that Brown would arrange for Moss to become a signatory to that account, an event which never occurred.

75.     In reliance on their false assurances that  he would be made a signatory of the Nova Scotia account, and based on the instruction from Schilleci that he was legally required to do so, Moss wired the $1.2 million.

76.     When this $1.2 million was added to the previous $800,000, a total of $2,000,000 had been deposited into an account at Bank of Nova Scotia to which Moss had no access.

77.     It is unknown to Plaintiffs if the $2 million which was deposited into the Bank of Nova Scotia has since been removed.

78.     On or about September 3, 2015,  contrary to Brown's representations, Schilleci told Moss that he was not going to be made a signatory on the Bank of Nova Scotia account. Schilleci also told Moss that he did not want to a signatory since if Brown was a crook, Moss would not be implicated.

79.     On or around that date, Moss called Brown asking for the money to be returned and for Brown to come to Florida to discuss the issues.  Brown said he would come to Florida the following week because he was raising $10 million to put back into FPS and to give to Moss's family as represented by Brown many times.

80.     On or around  following Wednesday or Thursday, Centennial Bank in Florida alerted Moss that JB had attempted to remove over $1 million from the account.  The Bank advised Moss that JB had been told that one of the signers must come into the branch.   JB responded that Joncas would soon be in to remove the money.

81.     Moss alerted  Schilleci  and  Tortorici  that  Brown,  through  JB,  had  tried

unsuccessfully to remove over a $1 million from an FPS account.  Schilleci told Moss that there was a good reason for Brown to do so but he would call Brown.  Schilleci called Moss again and told him that Brown as Director had the right to take the money and that there was nothing he could do about it.

82.     On or about September 11, 2015, Moss again asked to be made a signatory to the Bank of Nova Scotia account.  This did not happen.  Immediately thereafter Moss demanded the return of the $2,000,000 in funds.  This demand was ignored by Defendants.

### h.  The Brown Defendants Attempt to Remove Moss Altogether.

83.     In order to protect himself and FPS, Moss then removed the New FPS directors from the Chase Account to which they were signatories and opened up a new account.

84.     Immediately thereafter, on or about September 24, 2015, Joncas in his purported capacity of President, CEO and COO of FPS, arrived at FPS headquarters in Zephyrhills, Florida in an unauthorized attempt to terminate Moss's employment and status as Director and to clear the way for Defendants to complete their looting of all FPS assets.

85.     When he appeared at the FPS headquarters, Joncas handed a letter to Moss which purported to terminate his relationship with FPS.

86.     The very next day, the Defendants caused FPS to commence a law suit in the Florida State Court known as Florida Pharmacy Solutions, Inc. v. James Wesley Moss, served no one with the papers, and obtained an ex parte State Court injunction barring Moss from FPS.

87.     However, the basis for the law suit and for the ex parte injunction was blatantly false and, additionally, was inconsistent with the terms of the Letter of Agreement.

88.     In fact, Defendants have neither the operational nor the legal ability to operate FPS, and they have no intention of operating FPS.

89.     FPS is a heavily regulated business with licenses in many States.   If the Defendants had any actual intention of operating FPS, they would have to have first changed the licenses because of the change of corporate ownership.   They did not even attempt to do so. Without those licenses, FPS is not permitted to operate.

90.     Neither Brown nor any of his associates has any experience or skill in the pharmaceutical business in which FPS is engaged, nor have the Defendants taken any steps to acquire employees with such expertise.

91.     The movement of $2,000,000 into the Bank of Nova Scotia account has severely impaired FPS' ability to pay its vendors, and on October 2, 2015 Defendants issued a bad check to one of FPS's vendors.

92.     Moreover, in just the past week, Defendants have rejected orders sought to be placed with FPS and have generally conducted themselves in a manner consistent with liquidating FPS rather than operating it as a going concern.   Vendors are cancelling contracts with FPS, and the Defendants are laying off FPS employees, essentially closing the business.

93.     The purported ouster of Moss and the initiation of litigation based upon false allegations is one more step in the Defendants' scheme to extract all possible cash from FPS and close the business, and at present Moss has been locked out of FPS and is unable to operate the business, which is not being operated at all.

94.     Only after the Defendants had carried out their scheme, with the essential assistance of Schilleci, Tortorici, and Schilleci & Tortorici, and after $2,000,000 was removed from FPS and transferred out of the Country, did Schilleci, Tortorici, and Schilleci & Tortorici attempt to argue, inconsistently (1)  that they had never represented Moss or FPS and (2) that they now had a conflict of interest.   Despite this, on September 21, 2015, Schilleci acknowledged

via email on September 21, 2015 his and his firm's intimate knowledge and involvement in the

Mill City/FPS transaction.

95.     All of these actions as set forth in Paragraphs 1 – 92 constitute violations of

Federal law, as set forth infra.

## FIRST COUNT

### [Violation of Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)]

96.     Plaintiffs repeat and re-allege each and every factual statement and allegation set

forth in the preceding paragraphs as if set forth at length herein.

97.     The claims in this Count are alleged against all Defendants.

### Persons

98.     18 U.S.C. §1961(3) defines "persons" as any individual or entity capable of

holding a legal or beneficial interest in property.  All Defendants herein are "persons" as defined

by 18 U.S.C. §1961(3).

### Enterprise

99.     Defendants are an "enterprise" as defined by 18 U.S.C. §1961(4).

100.    Defendants engaged in a pattern of racketeering activity individually and through

their respective public and business entities to defraud Plaintiffs by requiring Plaintiffs to make

certain payments and/or confiscating Plaintiffs' money for which Defendants subsequently

derived benefits without providing any bargained for benefit to Plaintiffs.   All individual

Defendants and their associated public and business counterparts, as set forth, supra, formed an

enterprise and participated in this pattern of racketeering activity.

101.    In addition, Defendants also formed an "association in fact" enterprise within the

meaning of 18 U.S.C. §1961(4), the sole reason for the existence of which was to formulate and

to carry out, through a pattern of racketeering activity, a criminal and corrupt scheme of requiring Plaintiffs to make certain payments and take over control of FPS, in order to steal from and defraud Plaintiffs.

102.    The Defendants' enterprise and/or the "association in fact" enterprise was engaged in activities which directly or indirectly affected interstate commerce.

### Pattern of Racketeering Activity

103.    Continuously, between early 2015 and the present, Defendants knowingly and willfully conspired, through a pattern of various schemes, to require Plaintiffs to make certain payments, give access to bank accounts, sign documents, and relinquish control of FPS and/or perform certain activities for which Defendants subsequently derived benefits, as a condition of an illusory promise to provide shares in FPS Pharma and working capital which never materialized, and with the specific intent to steal from and otherwise defraud Plaintiffs.

104.    Defendants' aforesaid acts constitute "racketeering activity," as such acts would be indictable under Florida and/or Federal law, including, but not limited to, the following:

a.    Conspiracy Against Rights, 18 U.S.C. §241;

b.    Wire Fraud, 18 U.S.C. §1343;

c.    Mail Fraud, 18 U.S.C. §1341;

d.    Interference with commerce by threats or violence, 18 U.S.C 1951;

e.    Interstate and foreign travel or transportation in aid of racketeering enterprises, 18 U.S.C. §1952; and

f.    Engaging in monetary transactions in property derived from specified unlawful activity 18 U.S.C 1957;

105.    As a result of these actions, Plaintiffs were caused to suffer the loss of large sums of money, either by Defendants requiring Plaintiffs to make certain payments and/or by giving

Defendants access to FPS bank accounts for which Defendants derived benefits as a condition of an illusory promise to provide shares in FPS Pharma and working capital which never materialized. As a direct and proximate cause of Defendants' pattern of racketeering activity, Plaintiffs have suffered injuries and losses, including the total sum of all payments paid by Plaintiffs to Defendants or withdrawn by Defendants from FPS' bank accounts and the loss of FPS as an ongoing business.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, on this First Count as follows:

As immediate relief:

(a)     Injunctive relief to preserve the status quo which existed as of August 2, 2015, in order that FPS may be operated in the normal course of its business, including restoring management of the day-to-day operations of FPS to Moss, giving Moss control over all FPS bank accounts and barring Defendants from taking any adverse employment action against Moss.

(b)     An Order directing that all monies previously transferred from FPS to the Bank of Nova Scotia or to any other account under the control of the Defendants and/or their agents be wired to a bank to be designated by this Court and maintained under the control of this Court, subject to application by Moss and FPS for necessary working capital; and

As final relief:

(a)     An Order voiding the Letter of Agreement of August 3, 2015 and all subsequent actions by defendants and returning the status quo ante; and

(b)     Actual damages and treble damages and/or other punitive damages;

102390512.1

(c)     Interest;

(d)     Counsel fees and costs of suit; and

(e)     Such other relief as the Court and/or triers of fact may deem appropriate.

**SECOND COUNT**
**[Conspiracy to Violate Federal RICO -18 U.S.C. § 1962(d)]**

106.    Plaintiffs repeat and re-allege each and every factual statement and allegation set forth in the preceding paragraphs as if set forth at length herein.

107.    The claims alleged in this Count are alleged against all Defendants.

108.    The Defendants who participated in the enterprise described in the First Count did so with the common goal of defrauding Plaintiffs.

109.    Defendants agreed to commit the predicate acts specified in the First Count and to violate 18 U.S.C. §1962 (c).

110.    Defendants' scheme was organized in a manner in which all participants agreed and in fact, either directly, or indirectly through other participants, to require Plaintiffs to make certain payments and/or giving Defendants access to FPS bank accounts for which Defendants derived benefits, as a condition of as a condition of an illusory promise to provide shares in Mill City and working capital which never materialized. As such, the conspiracy violates 18 U.S.C. §1962(d).

111.    As a direct and proximate cause of the aforesaid conspiracy, Plaintiffs have suffered injuries and losses, including the total sum of all payments and/or monies removed by Defendants or at their direction as well as the loss of FPS as an ongoing business.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, on this Second Count as follows:

102390512.1

As immediate relief:

    (a)    Injunctive relief to preserve the status quo which existed as of August 2, 2015, in order that FPS may be operated in the normal course of its business, including restoring management of the day-to-day operations of FPS to Moss, giving Moss control over all FPS bank accounts and barring Defendants from taking any adverse employment action against Moss.

    (b)    The immediate transfer of all monies transferred from FPS to the Bank of Nova Scotia or to any other account under the control of the Defendants and/or their agents to a bank to be designated by this Court and maintained under the control of this Court, subject to application by Moss and FPS for necessary working capital; and

As final relief:

    (a)    Voiding the Letter of Agreement of August 3, 2015 and all subsequent actions by defendants and returning the status quo ante; and

    (b)    Actual damages and treble damages and/or other punitive damages;

    (c)    Interest;

    (d)    Counsel fees and costs of suit; and

    (e)    Such other relief as the Court and/or triers of fact may deem appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury as to all issues so triable.

Dated: October 7, 2015

Respectfully submitted,

Benjamine Reid
Florida Bar No. 183522
Of Counsel:                                                  Nicholas A. Brown
                                                             Florida Bar No. 90929
Stephen J. Edelstein                                         **CARLTON FIELDS JORDEN BURT, P.A.**
Schwartz Simon Edelstein & Celso, LLC                        100 S.E. Second Street, Suite 4200
100 South Jefferson Avenue Suite 200                         Miami, FL 33131-2113
Whippany, New Jersey 07981                                   Tel: (305) 530-0050
Telephone :( 973)301-0001                                    Fax: (305) 530-0055
Fax: (973)993-3152                                           breid@cfjblaw.com
sedelstein@sseclaw.com                                       asola@cfjblaw.com
 (*pro hac pending*)                                         nbrown@cfjblaw.com
                                                             miaecf@cfdom.net

                                                             Attorneys for Plaintiffs

## VERIFICATION

**JAMES WESLEY MOSS** verifies as follows:

1.      I am the shareholder and president of Florida Pharmacy Solutions, Inc. and an individual plaintiff in this action.

2.      I have reviewed the contents of the Verified Complaint and am personally familiar with the allegations contained therein.

3.      The contents of the within Verified Complaint are true to the best of my knowledge.

I hereby certify that the foregoing statements made by me are true, and I understand that if any of the statements made by me are willfully false, I am subject to punishment.

JAMES WESLEY MOSS

Dated: October ____7____, 2015

102390512.1

# Exhibit A

**FILED**
2015 Sep-25 PM06:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# LETTER OF AGREEMENT

August 3, 2015

**BETWEEN**

Mill City Gold Corp.
4719 Chapel Road NW
Calgary, AB T2L 1A7
CANADA

**Attn: James R. Brown, President**

(hereinafter referred to as the "Purchaser")

**AND**

Florida Pharmacy Solutions, Inc.
38444 5th Avenue
Zephyrhills, FL 33542
USA

**Attn: Wes Moss, President**

(hereinafter referred to as the "Vendor")

(collectively hereinafter referred to as the "Parties")

Gentlemen:

This Letter of Agreement ("LOA") is intended to set out the terms and conditions under which Mill City Gold Corp. ("Mill City") can acquire 100% of the issued and outstanding shares of Florida Pharmacy Solutions, Inc. ("FPS") as more particularly described in APPENDIX A herein.

The terms and conditions of the proposed acquisition are as follows:

## Proposed Structure and Timing

I.      Mill City Gold Corp. ("Purchaser" and/or "Mill City") seeks to purchase 100% of the issued and outstanding shares of FPS in return for the following:

        a.   25,000,000 common shares of Mill City (the "Purchase Payment Shares"), which shares shall be subject to such resale restrictions and hold periods as may be imposed under applicable securities laws and the policies of the Canadian Securities Exchange ("CSE"). Mill City has made application to have its shares listed for trading on the CSE and is awaiting final approval. The Purchase Payment Shares will be issued at a deemed value of US$0.50 per share for a total consideration of US$12.5 million.

        It is anticipated that the Purchase Payment Shares would be escrowed and released from escrow by Mill City over a forty-eight (48) month period as follows:

- 1 -



12 months from the listing date –10% of the total escrow securities
18 months from the listing date –15% of the total escrow securities
24 months from the listing date –15% of the total escrow securities
30 months from the listing date –15% of the total escrow securities
36 months from the listing date –15% of the total escrow securities
42 months from the listing date –15% of the total escrow securities
48 months from the listing date –15% of the total escrow securities

 b. Mill City will make available one (1) Board position on its Board of Directors.

 c. The future sale of any Purchase Payment Shares (the "Shares") shall be subject to a ten day right of first refusal to Mill City and/or their nominee. The holder of any Shares shall provide written notice to Mill City via email at info@millcitygold.com of their desire to sell a specific quantity of Shares and Mill City and/or their nominee shall have ten days to purchase such specific quantity of Shares.  If at the end of the ten day period Mill City and/or their nominee have not purchased the Shares, the holder of these Shares shall have the right to sell such Shares subject to any applicable securities laws.

 d. The FPS shareholders listed in Appendix A shall vote any and all of their Shares in favor of current management for a period of 48 months from the date Mill City's shares are listed for trading on the CSE.

II. The transaction contemplated herein is subject to Mill City shareholder approval, FPS shareholder approval and the approval of any regulatory bodies having jurisdiction over the trading of the shares of Mill City, including the Canadian Securities Exchange.

III. Upon closing of the transaction contemplated herein, FPS shall continue as an ongoing Florida corporation that is a wholly owned subsidiary of Mill City. Thereafter, the day to day operations, management and decision making related to FPS' business shall be determined by FPS' existing management in conjunction with Mill City.

**The Parties hereby agree to the terms outlined in this LOA:**

**Mill City Gold Corp.**

James R. Brown, President

Date AUGUST 3, 2015

**Florida Pharmacy Solutions, Inc.**

James Wesley Moss, President

Date 8/3/15

- 2 -